1  JOSHUA OSBORNE-KLEIN (WSB #36736)
   KRISTEN L. BOYLES (CSB #158450)
2  Earthjustice
   705 Second Avenue, Suite 203
3  Seattle, WA  98104
   (206) 343-7340
4  (206) 343-1526 *[FAX]*
   josborne-klein@earthjustice.org
5  kboyles@earthjustice.org

6
   SHELLEY DAVIS (CSB #84539)
7  VIRGINIA RUIZ (CSB #194986)
   Farmworker Justice
8  1126 – 16th Street, N.W., Suite 270
   Washington, D.C.  20036
9  (202) 293-5420
   (202) 293-5427 *[FAX]*
10 sdavis@nclr.org
   vruiz@nclr.org
11

12 *Attorneys for Plaintiffs*
   *(complete list of parties on signature page)*
13

14 GREGORY C. LOARIE (CSB #215859)
   Earthjustice
15 426 - 17th Street, 5th Floor
   Oakland, CA  94612
16 (510) 550-6725
   (510) 550-6749 *[FAX]*
17 gloarie@earthjustice.org

18 *Local Counsel for Plaintiffs*

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -1-

1
2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

3
4
5
6
7
8
9
10
11
12
13

PESTICIDE ACTION NETWORK NORTH
AMERICA, UNITED FARM WORKERS,
NATURAL RESOURCES DEFENSE COUNCIL,
TEAMSTERS LOCAL 890, BEYOND
PESTICIDES, PINEROS Y CAMPESINOS
UNIDOS DEL NOROESTE, CENTER FOR
ENVIRONMENTAL HEALTH, FARM LABOR
ORGANIZING COMMITTEE, AFL-CIO, and
ALASKA COMMUNITY ACTION ON TOXICS,

                    Plaintiffs,

          v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

                    Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  CV08-3542-VRW


COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -2-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1.      This is an action for declaratory judgment and injunctive relief focused on the inherently dangerous pesticide endosulfan.  It arises under and asserts violations of the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. §§ 136-136y, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544.

2.      Endosulfan is a toxic, persistent, and bioaccumulative organochlorine insecticide that is banned in many parts of the world but is still registered for use on farms across the United States.  On July 31, 2002, the United States Environmental Protection Agency ("EPA") determined that many uses of endosulfan were eligible for reregistration under FIFRA, even though EPA's limited analysis of the risks and benefits of endosulfan revealed that endosulfan uses result in severe risks to both humans and the environment and only marginal benefits to growers.

3.      In making this reregistration determination, EPA failed to consider critical factors relating to endosulfan's registration eligibility, including the risks to children and bystanders from endosulfan in the ambient air and the endocrine-disrupting properties of the pesticide.  EPA confirmed that endosulfan travels far distances from application sites and is detected in remote areas such as the Arctic and national parks; it bioaccumulates in food chains and poisons wildlife; and it threatens the health of farmworkers who mix, load, and apply endosulfan for agricultural purposes and who enter fields following application.

4.      This action seeks a declaration that EPA acted arbitrarily, capriciously, and in violation of FIFRA in reregistering and maintaining the registrations for endosulfan in light of the severe risks posed by endosulfan, the minimal benefits associated with the pesticide, and the omissions in EPA's risk and benefit assessments.  Plaintiffs seek an injunction that (1) requires EPA to make a new reregistration eligibility decision for endosulfan based on unreasonable adverse effects findings and risk-benefit analyses that fully incorporate all health, environmental, economic, and social risks and benefits of each endosulfan use; (2) prohibits EPA from reregistering uses of endosulfan unless the pesticide registrants prove that the benefits of the endosulfan use outweigh the specific risks associated with that use; and (3) imposes interim

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -3-

protective measures to prevent harm to children, farmworkers, and bystanders in agricultural communities near areas where endosulfan is used until EPA brings its endosulfan registration into compliance with the law.

5.    Additionally, EPA did not initiate and complete ESA section 7(a)(2) consultations with the United States Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (collectively "the Services") on its endosulfan reregistration decision, or its subsequent maintenance of the endosulfan registrations, to ensure that these registrations will not jeopardize the survival and recovery of threatened and endangered species and will not destroy or adversely modify their designated critical habitat.  This action seeks a declaration that EPA has violated ESA section 7(a)(2) by reregistering and allowing continued use of endosulfan without completing consultations with the Services and without ensuring that the registered endosulfan uses will not jeopardize listed species and will not destroy or adversely modify their designated critical habitat.  Plaintiffs seek an order (1) compelling EPA to initiate consultations with the Services regarding the effects of endosulfan on threatened and endangered species that may be affected by the pesticide; and (2) granting interim protective measures to prevent harm to listed species and their designated critical habitat until the consultation process is complete and EPA brings the endosulfan registrations into compliance with the ESA.

JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

6.    This action is brought pursuant to section 16(a) of FIFRA, 7 U.S.C.§ 136n(a), and section 11(g)(1) of the ESA, 16 U.S.C. § 1540(g)(1).  This Court has jurisdiction pursuant to 7 U.S.C.§ 136n(a), 16 U.S.C. § 1540(g)(1), and 28 U.S.C. § 1331.  As required by the ESA citizen suit provision, plaintiffs Beyond Pesticides and Natural Resources Defense Council provided a 60-day notice of intent to sue on May 13, 2008, to the Services and defendant EPA. A copy of the 60-day notice is appended as Exhibit A.

7.    Venue is properly vested in this Court under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3) as a number of the plaintiffs reside in this district and many of the consequences of

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -4-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    the defendant's violations of the law giving rise to the claims occur in this district.

2        8.        This case is properly assigned to the San Francisco/Oakland Division under Civil

3    L.R. 3-2(c) because at least two of the plaintiffs are located in San Francisco County.

4                                                        PARTIES

5        9.        The plaintiffs in this action are:

6        A.        Pesticide Action Network North America ("PANNA"), a San Francisco-based

7    non-profit organization that serves as an independent regional center for Pesticide Action

8    Network International, a coalition of over 600 public interest organizations in more than 90

9    countries.  For more than 20 years, PANNA has worked to replace hazardous and unnecessary

10   pesticide uses with ecologically sound pest management across North America.  PANNA

11   provides scientific expertise, public education, access to pesticide data and analysis, policy

12   development, and other support to its approximately 225 member organizations.  PANNA has

13   approximately 2,700 individual members nationwide and approximately 90 organizational

14   members in California alone.  PANNA's U.S. membership includes a number of groups who

15   directly represent or advocate on behalf of farmworkers and whose membership includes

16   farmworkers and persons living on or near farms.  PANNA and its foreign affiliates have long

17   campaigned for more stringent regulation of endosulfan.  For example, in February 2008,

18   PANNA submitted a petition and a technical comment letter calling for EPA to cancel all

19   remaining uses of endosulfan and revoke all food residue tolerances.  PANNA also submitted

20   comments on EPA's 2001 Human Health Risk Assessment of Endosulfan.  PANNA and its

21   foreign affiliates played a role in getting endosulfan banned in the European Union and many

22   other nations and are participating in efforts to get endosulfan listed as a persistent organic

23   pollutant under the Stockholm Convention.

24       B.        United Farm Workers ("UFW"), the nation's oldest and largest farmworker

25   membership organization.  UFW is headquartered in California and serves farmworkers in

26   offices all across the country including offices in Salinas and Santa Rosa, California.  UFW has

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -5-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    represented farm workers for more than 40 years and currently has more than 27,000 members,

2    many of whom are migrant and seasonal farmworkers.  UFW's mission is to protect and expand

3    farmworkers' labor rights, including rights pertaining to health and safety issues.  UFW works to

4    protect the health and safety of farmworkers from occupational injuries, including injuries

5    caused by exposure to endosulfan and other pesticides.

6        C.    Natural Resources Defense Council ("NRDC"), a national environmental

7    advocacy group organized as a New York not-for-profit membership corporation.  NRDC is

8    registered to do business in California and maintains an office in San Francisco.  NRDC has over

9    420,000 members nationwide.  NRDC and its members work to ensure that the health of humans,

10   wildlife, and ecosystems is not diminished by the use of toxic pesticides.  In January 2003,

11   NRDC submitted comments to EPA critiquing the 2002 reregistration eligibility decision for

12   endosulfan.  In February 2008, NRDC submitted comments on EPA's 2007 updated human

13   health and ecological effects risk assessments for endosulfan and petitioned EPA to cancel all

14   uses of endosulfan and revoke all tolerances.

15       D.    Teamsters Local 890, a union founded in 1943 that represents approximately

16   10,000 workers in California and Arizona, including 2,000 agricultural workers in Salinas

17   Valley, Oxnard area, Huron area, and Imperial Valley in California, as well as the Yuma area of

18   Arizona.  The Union negotiates contracts to improve the members' wages and working

19   conditions and works to protect its members from pesticide exposures and provide health care to

20   farm workers and their families.  Local 890's members include workers who have harvested and

21   will continue to harvest vegetables treated with endosulfan.  Local 890's members and their

22   families also live and go to school in areas where endosulfan drifts and settles.

23       E.    Beyond Pesticides, a non-profit membership organization that serves a nationwide

24   network of individuals and groups working to increase the safe use of pesticides and reduce or

25   end the use of dangerous chemicals such as endosulfan.  Beyond Pesticides is based in

26   Washington, D.C., and has more than 2,000 individual and organizational members in California

27   and other states.  Beyond Pesticides advocates on behalf of farmworkers, individuals, and

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -6-

communities exposed to pesticides such as endosulfan.  Beyond Pesticides also seeks to protect

wildlife and ecosystems from the harmful effects of endosulfan and other pesticides.  Beyond

Pesticides' primary goal is to assist individuals and organizations in identifying the hazards of

pesticides, providing information on safer alternatives, and promoting policy changes that

increase the protections to humans and the environment from pesticides.

F.      Pineros y Campesinos Unidos del Noroeste (Northwest Treeplanters and

Farmworkers United or "PCUN"), based in Woodburn, Oregon, the state's only union of

farmworkers, nursery, and reforestation workers.  Its mission is to establish better working and

living conditions for its members, who work on crops treated with endosulfan, and live in

communities where this pesticide drifts and is tracked indoors following application.

G.      Center for Environmental Health ("CEH"), a non-profit organization based in

Oakland, California.  CEH works to protect low-income communities and communities of color

from exposure to pesticides and other toxic chemicals.  In furtherance of this mission, CEH

promotes sustainable food production practices and works to eliminate exposure to toxic

substances such as endosulfan.  CEH is an organizational member of PANNA and is the

coordinator of "Californians for a Healthy and Green Economy," a statewide chemicals policy

reform coalition that promotes policies and legislation to require chemical companies to prove

the safety of their products before they are allowed on the market.  In 2007, CEH supported

comments submitted to EPA on the agency's list of 73 pesticides, including endosulfan, that

EPA had designated for screening as endocrine disruptors.

H.      Farm Labor Organizing Committee, AFL-CIO ("FLOC"), a national union that

represents migrant and seasonal farmworkers.  It was founded in 1968 and is based in Toledo,

Ohio.  FLOC's mission is to organize farmworkers so that they can secure more power to

improve their working conditions, including reducing their exposure to pesticides.  FLOC

currently has approximately 12,000 members in Ohio, Michigan, North Carolina, and Virginia.

FLOC members work with many crops that are registered to receive endosulfan treatments,

including tomatoes, cucumbers, potatoes, peppers, strawberries, blueberries, apples, and tobacco.

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -7-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

I.      Alaska Community Action on Toxics ("ACAT"), an Alaska-based environmental health and justice organization founded in 1997, with 375 supporters located throughout the State of Alaska and a contact list of over 3,000.  ACAT's mission is to assure clean air, clean water, and toxic-free foods for the people of Alaska by advocating for environmental and community health.  In furtherance of this mission, ACAT provides technical assistance and support to individuals, tribes, and other communities relating to the health and environmental impacts of toxic contaminants such as endosulfan, which affects the waters, traditional foods, health, and cultures of the indigenous people throughout Alaska.  ACAT also works to motivate public support to instigate local, national, and international policies to protect the health of people, wildlife, and the environment from environmental contaminants.  ACAT submitted public comments to the EPA on the updated risk assessment for endosulfan in 2008, particularly focusing on the adverse effects of endosulfan on Arctic ecosystems and peoples.

10.      Plaintiffs have been and will continue to be injured when they and their members mix, load, and apply endosulfan for agricultural purposes; prune, thin, or harvest crops that contain residues of endosulfan; and work or live in areas where endosulfan drifts and settles.  Every year, plaintiffs and their members are exposed to endosulfan at levels that may cause poisoning.  The continued exposure of the plaintiffs' members to the harmful effects of endosulfan are a direct result of EPA's decisions to reregister endosulfan uses.

11.      Plaintiffs NRDC and Beyond Pesticides and their members live, use, and recreate in areas near where endosulfan is applied or where endosulfan has traveled.  NRDC, Beyond Pesticides, and their members have professional, economic, aesthetic, and recreational interests that have been and will continue to be injured by the reregistration of endosulfan uses and the impacts that this pesticide has and will continue to have on beneficial insects and threatened and endangered species.

12.      The past, present, and future enjoyment of these interests by plaintiffs and their members have been, are being, and will continue to be irreparably harmed by EPA's disregard of its statutory duties, which results in unlawful injuries to farmworkers, children and other

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -8-

1  bystanders, and the environment.

2        13.    The aesthetic, conservation, recreational, commercial, and scientific interests of

3  plaintiffs and their members in minimizing harm to people and the environment from the use of

4  endosulfan, as well as their interest in ensuring compliance with environmental law by federal

5  agencies, have been, are being, and, unless the relief prayed for is granted, will continue to be

6  directly and adversely affected by the failure of defendants to comply with the law.

7        14.    The defendant in this action is the United States Environmental Protection

8  Agency, an agency of the United States charged with registering and reregistering pesticides

9  under FIFRA and with ensuring that the authorized pesticide uses will not cause unreasonable

10  adverse effects on the environment.  EPA is also charged with ensuring, through consultation

11  with the Services, that its pesticide registrations will not jeopardize the survival and recovery of

12  listed species or destroy or adversely modify their designated critical habitat.

BACKGROUND

13
14  I.    STATUTORY FRAMEWORK FOR REGISTERING AND REREGISTERING
         PESTICIDES

15        A.    Federal Insecticide, Fungicide and Rodenticide Act Requirements

16        15.    FIFRA establishes a registration scheme for pesticides.  Under FIFRA, a pesticide

17  may generally not be sold or used in the United States unless it has an EPA registration for a

18  specified use.  7 U.S.C. § 136a(a).  To register or reregister a pesticide, EPA must determine

19  that:

20        (A)    its composition is such as to warrant the proposed claims for it;

21        (B)    its labeling and other material required to be submitted comply with the

22  requirements of this Act;

23        (C)    it will perform its intended function without unreasonable adverse effects on the

24  environment; and

25        (D)    when used in accordance with widespread and commonly recognized practice it

26  will not generally cause unreasonable adverse effects on the environment.

27
28
COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -9-

Id. § 136a(c)(5).

16.    FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." Id. § 136(bb).  In order for EPA to register or reregister a pesticide use, it must find that the use will not pose any unreasonable adverse effects under this standard because the benefits of the pesticide uses outweigh the risks.

17.    FIFRA also defines "unreasonable adverse effects on the environment" to include any human dietary risk that is not "safe" under the Federal Food Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. §§ 301-394, as amended by the Food Quality Protection Act ("FQPA"), Pub. L. No. 104-170, 110 Stat. 1489 (1996).  7 U.S.C § 136(bb).  The FFDCA, as amended, defines "safe" as "a reasonable certainty that no harm will result from aggregate exposure to the pesticide residue, including all anticipated dietary exposures and all other exposures for which there is reliable information."  21 U.S.C. §§ 346a(b)(2)(A)(i)-(ii).

18.    The culmination of the registration process is EPA's approval of both a registration and a label for the particular pesticide uses.  FIFRA makes it unlawful to use a pesticide in a manner inconsistent with the label, 7 U.S.C. § 136j(2)(G), or to make any claims that differ substantially from the label, id. § 136j(1)(B).

19.    EPA has the authority to cancel a pesticide registration whenever the "pesticide or its labeling or other material required to be submitted does not comply with the provisions of this Act or, when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment."  Id. § 136d(b).

20.    Under FIFRA's risk-benefit standard, EPA cannot allow pesticide uses that result in human or ecological risks of concern to persist unless the pesticide registrant proves that, considering all risks and benefits, the benefits of the pesticide use outweigh the risks.  Id. §§ 136a(c)(5)(C)-(D).

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -10-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

21.     EPA has no standard regulation or policy establishing a uniform process for assessing the benefits of pesticide uses that pose risks of concern to humans or wildlife.  Expert bodies, such as the National Academy of Sciences, have recommended that EPA develop such a policy to avoid arbitrary and unprincipled risk-benefit decisionmaking under FIFRA.  In the absence of such a regulation or policy, EPA staff compiles information on the risks and benefits of pesticides on an *ad hoc* basis.

B.      Endangered Species Act Mandates

22.     Section 7(a)(2) of the ESA requires federal agencies to "insure that any action authorized, funded, or carried out by such agency is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2).

23.     Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat.  An agency must initiate consultation with NMFS or FWS under section 7 whenever it takes an action that "may affect" a listed species.  50 C.F.R. § 402.14(a). The threshold for a "may affect" determination and required ESA section 7 consultation is low. See 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement.").

24.     As a result of consultation, the federal agency will obtain either a written concurrence letter from NMFS or FWS that the proposed action is "not likely to adversely affect" listed species or their habitat, 50 C.F.R. §§ 402.13, 402.14(b)(1), or a biological opinion evaluating the effects of the federal action on listed species and their critical habitat.  Id. § 402.14(a).  If NMFS or FWS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NMFS or FWS must propose a reasonable and prudent alternative, if available, that will mitigate the proposed action so as to

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -11-

1   avoid jeopardy and/or adverse modification of critical habitat.  16 U.S.C. § 1536(b)(3).

2       25.     Separately, ESA section 7(d) prohibits federal agencies, after the initiation of

3   consultation under section 7(a)(2), from making any irreversible or irretrievable commitment of

4   resources if doing so would foreclose the implementation of reasonable and prudent alternatives.

5   Id. § 1536(d).

6       26.     Federal agencies and the Services must use the best available science and

7   commercial data in their section 7(a)(2) consultations.  Id. § 1536(a)(2).

8   II.    ENDOSULFAN

9       A.     History and Usage

10      27.     Endosulfan was first registered in 1954 and is one of the few organochlorine

11  pesticides still registered for use in the United States; EPA has cancelled most other

12  organochlorines, such as DDT, mirex, aldrin, and dieldrin, due to their extreme toxicity,

13  mobility, and persistence in the environment.  EPA estimates that 1.38 million pounds of

14  endosulfan active ingredient were used annually in the United States between 1987 and 1998.

15  Endosulfan Reregistration Eligibility Decision ("RED") at v, 6.

16      28.     Endosulfan is currently banned in the European Union and over 20 nations

17  including Bahrain, Belize, Cambodia, Columbia, Kuwait, Oman, Pakistan, the Philippines,

18  Qatar, Saudi Arabia, Singapore, St. Lucia, Sri Lanka, Syria, Tonga, and the United Arab

19  Emirates.  Endosulfan is currently proposed to be added to the Stockholm Convention's list of

20  persistent organic pollutants, which would prohibit its use in all 131 nations that are parties to the

21  treaty (the United States is not a party to the Stockholm Convention).

22      29.     In the late 1980s, EPA initiated consultation with FWS pursuant to section 7(a)(2)

23  of the ESA on the effects of the then-registered endosulfan uses on threatened and endangered

24  species.  In a 1989 biological opinion, FWS found that registered endosulfan uses jeopardized

25  the survival and recovery of 41 aquatic species and two terrestrial species and prescribed

26  mitigation measures to avoid such jeopardy.  See Endosulfan RED at 33-34.  On information and

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -12-

belief, EPA has never implemented the mitigations prescribed in the 1989 biological opinion, despite recognizing that new circumstances, including new ESA listings and the completion of the endosulfan reregistration eligibility decision, required reconsideration of the risks endosulfan poses to threatened and endangered species.  See Endosulfan RED at 33.

30.     On February 19, 2008, plaintiffs PANNA and NRDC submitted petitions to EPA, signed by over 13,000 individuals, calling for EPA to cancel all remaining registrations of endosulfan and revoke all endosulfan food residue tolerances.  Along with the petitions, the organizations submitted technical comments critiquing EPA's 2007 updated human health and ecological effects risk assessments for endosulfan.  As of the date of this complaint, EPA has not responded to PANNA and NRDC's endosulfan petition.

B.     Toxicity and Environmental Fate

31.     Endosulfan is currently classified in the group of pesticides with the greatest toxicity (toxicity class I).  Exposure to endosulfan may cause hyperactivity, tremors, convulsions, lack of coordination, staggering, difficulty breathing, nausea, diarrhea, unconsciousness, permanent brain damage, deficits in learning and memory, coma, and death. Exposure to endosulfan is also believed to cause endocrine disruption, which results in developmental and reproductive effects including testicular atrophy, parathyroid hyperplasia, and increased pituitary and uterine weight.  Endosulfan RED at 11.  A peer reviewed scientific study found an association between pre-natal endosulfan exposures and increased incidence of autism spectrum disorder.

32.     Endosulfan is a persistent and bioaccumulative toxin that contaminates air, surface water, ground water, soil, and food chains.  Endosulfan is highly mobile in the atmosphere and has been detected in areas far from use sites, including national parks and the Arctic.  It has been detected in the tissues of numerous animal species, including the threatened polar bear, endangered California red-legged frog, minke whale, and northern fulmar (an Arctic seabird).  It has also been detected in the tissues and breast milk of pregnant mothers; drinking

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -13-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    water; and ambient air at schools, playgrounds, and other sites where children are likely to be

2    exposed to the poison.

3        C.    EPA's Reregistration Eligibility Decision

4        33.    While the rest of the world was working to ban endosulfan, on July 31, 2002,

5    EPA completed its reregistration eligibility decision for endosulfan and decided to allow

6    continued use of endosulfan on a wide variety of crops including alfalfa, almonds, apples,

7    apricots, blueberries, broccoli, Brussels sprouts, cabbage, carrots, cauliflower, celery, cherries,

8    cotton, cucumbers, eggplant, filbert nuts, lettuce, macadamia nuts, melons, nectarines, non-

9    bearing citrus, peaches, pears, peppers, pineapples, plums/prunes, potatoes, squash, strawberries,

10    sweet corn, sweet potatoes, tobacco, tomatoes, and walnuts.  Endosulfan RED at 57-72.

11        34.    In the Endosulfan decision, EPA identified farmworker "risks of concern"

12    resulting from endosulfan uses.  EPA prescribed mitigation to reduce these farmworker risks,

13    including use of personal protective equipment (such as chemical resistant clothing and

14    respirators), use of engineering controls (such as closed pesticide mixing, loading, and

15    application systems designed to reduce contact with the poisons), use restrictions, and reductions

16    in maximum application rates.  EPA determined that implementation of such mitigation would

17    eliminate most endosulfan risks of concern to farmworkers.  Endosulfan RED at 57-72.

18        35.    However, EPA failed to evaluate other significant risks from endosulfan.  For

19    example, EPA ignored well-documented evidence of child and bystander exposures to

20    endosulfan that drifts from fields into homes, schools, playgrounds, and other areas.  EPA also

21    acknowledged that "[e]ndosulfan is a potential endocrine disruptor," Endosulfan RED at 11, but

22    failed to include endocrine disruption in its risk assessments or take the steps necessary to protect

23    children, bystanders, and wildlife from the impacts associated with endocrine disruption.  See

24    Endosulfan RED at 48-49.  Both FIFRA and the FFDCA require EPA to assess such exposures;

25    however, EPA did not examine such exposures under either FIFRA's "unreasonable adverse

26    effects" standard or the FFDCA's "reasonable certainty of no harm" standard.

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -14-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

36.     EPA also determined that several endosulfan uses present substantial "risks of concern" to birds, mammals, aquatic organisms, and endangered and threatened species. Endosulfan RED at 28-35. EPA noted particular concern regarding the impacts of endosulfan on amphibian species listed or proposed for listing under the ESA. Endosulfan RED at 32. EPA concluded that "all currently registered uses of endosulfan" posed risks of concern "to all taxa fo [sic] endangered/threatened animals – birds, mammals, aquatic invertebrates, amphibians, reptiles and terrestrial . . . ." Endosulfan RED at 33. And EPA recognized that its ecological risk assessments likely underestimated the risks of endosulfan because its "[e]xposure estimates for terrestrial animals represent parent endosulfan only and do not take into account residues from the more persistent and assumed to be equally toxic endosulfan sulfate," which is an environmental degradate of endosulfan. Endosulfan RED at 28.

37.     In response to the acknowledged wildlife risks, EPA prescribed mitigation measures, including application buffers, reductions in application rates, and deletion of certain uses, but never assessed whether these measures would reduce some or all of the ecological risks posed by endosulfan uses. Moreover, EPA never consulted with the Services to determine whether, with the prescribed mitigation, endosulfan uses would cause jeopardy to the survival and recovery of threatened and endangered species or adverse modification of their critical habitat.

38.     While EPA found that endosulfan uses presented considerable risks to humans and the environment, it also concluded that such uses provide few, if any, benefits to growers. For example, for some of the most significant endosulfan uses (cotton, tobacco, and Florida tomatoes), EPA determined that it "does not believe that the impacts of a cancellation of endosulfan on these crops would result in important impacts" and further recognized that "in all cases, alternatives exist that could effectively replace endosulfan, usually at fairly moderate increases in cost." 7/12/2002 BEAD Assessment at 2. EPA has provided no rationale that justifies its decision to reregister dangerous endosulfan uses that provide, at best, marginal benefits to growers.

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -15-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF
<u>Violation of FIFRA</u>:
<u>Failure to Consider All Factors Necessary to Evaluate "Unreasonable Adverse Effects"
From Reregistering Endosulfan</u>

39.     In order to register or reregister a pesticide use, EPA must determine that the use "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. §§ 136a(c)(5). FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." <u>Id.</u> § 136(bb). In order to satisfy this standard, EPA must consider all relevant health, environmental, economic, and social risks and benefits of the pesticide use and determine that the benefits outweigh the risks. The pesticide registrant bears the burden of proving that the benefits of a pesticide use outweigh the risks.

40.     In determining that endosulfan uses are eligible for reregistration under FIFRA, EPA failed to conduct a complete assessment of the risks and benefits of endosulfan. The critical omissions in EPA's endosulfan assessments include but are not limited to EPA's failure to consider and adequately assess: (a) the risks to children and bystanders resulting from endosulfan that drifts from fields following application, and (b) the endocrine-disrupting effects of endosulfan on humans and wildlife.

41.     Because EPA failed to consider and adequately assess many important factors bearing on the risks and benefits of endosulfan, including but not limited to those listed above, EPA lacked a basis for determining that the benefits of endosulfan uses outweigh the risks. By failing to conduct a complete risk-benefit assessment that considered all important factors relevant to endosulfan's reregistration eligibility, EPA's decision that endosulfan is eligible for reregistration was arbitrary, capricious, and contrary to FIFRA.

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -16-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

SECOND CLAIM FOR RELIEF
Violation of FIFRA:
Failure to Rationally Balance Risks and Benefits of Endosulfan Reregistration

42.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." Id. § 136(bb). In order to satisfy this standard, EPA must consider all relevant health, environmental, economic, and social risks and benefits of the pesticide use and determine that the benefits outweigh the risks. The pesticide registrant bears the burden of proving that the benefits of a pesticide use outweigh the risks.

43.     Despite the flaws in EPA's endosulfan risk and benefits assessments, EPA admitted that many endosulfan uses pose substantial risks – both in amount of risk and the type of risk – to humans and the environment and provide only marginal benefits to growers. EPA proffered no rationale for how these marginal benefits outweigh the substantial risks posed by endosulfan. EPA's failure to articulate any rational connection between its risk and benefit findings and its ultimate decision that endosulfan was eligible for reregistration was arbitrary, capricious, and contrary to FIFRA.

THIRD CLAIM FOR RELIEF
Violation of the Endangered Species Act:
Failure to Consult on Impacts to Threatened and Endangered Species
From Reregistration of Endosulfan

44.     Under ESA section 7(a)(2), "[e]ach federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

45.     To ensure that the substantive mandate in section 7(a)(2) is fulfilled, the ESA requires federal agencies to consult with the Services whenever a federal action "may affect" a listed species or designated critical habitat. 50 C.F.R. § 402.14(a). The threshold for a "may affect" determination and the required ESA section 7(a)(2) consultation is low. See 51 Fed. Reg.

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF    -17-

1    19926, 19949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an

2    undetermined character, triggers the formal consultation requirement.").

3        46.    In its reregistration eligibility determination for endosulfan, EPA found that uses

4    of the pesticide pose "risks of concern" to threatened and endangered species.  EPA's findings of

5    "risks of concern" for threatened and endangered species equate with "may affect" findings that

6    trigger the ESA consultation mandate.  EPA has never consulted under ESA section 7(a)(2) with

7    the Services on the 2002 decision to reregister endosulfan uses or the subsequent maintenance of

8    that registration.  This failure to consult on an action that "may affect" listed species violates the

9    Endangered Species Act.

PRAYER FOR RELIEF

10    WHEREFORE, plaintiffs respectfully request that the Court:

11        A.    Adjudge and declare that EPA acted arbitrarily, capriciously, and contrary to

12    FIFRA in reregistering uses of endosulfan;

13        B.    Adjudge and declare that EPA violated section 7(a)(2) of the ESA by reregistering

14    endosulfan uses and maintaining endosulfan reregistrations without consulting with the Services

15    and without ensuring that the reregistered uses will not jeopardize the survival and recovery of

16    threatened and endangered species or destroy or adversely modify their designated critical

17    habitat;

18

19        C.    Order EPA to either cancel endosulfan or make a new reregistration eligibility

20    decision for endosulfan on an expeditious basis in which EPA: (1) makes unreasonable adverse

21    effects determinations based on full consideration and balancing of environmental, health,

22    economic, and social risks and benefits from endosulfan uses, including all risks to children and

23    other bystanders from all potential exposure routes; (2) reregisters an endosulfan use only when

24    the pesticide registrants have proved that the health, environmental, economic, and social

25    benefits outweigh the risks; and (3) ensures, based on completed section 7(a)(2) consultations,

26    that the reregistered endosulfan uses will not jeopardize the survival and recovery of threatened

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -18-

1    and endangered species or destroy or adversely modify their critical habitat;

2        D.    Order EPA to consult with the Services pursuant to section 7(a)(2) of the ESA on

3    any endosulfan uses that "may affect" a listed species, and ensure, based on the consultations,

4    that the endosulfan registrations will not jeopardize the survival and recovery of listed species or

5    adversely modify their critical habitat;

6        E.    Order interim protective measures to prevent harm to children and other

7    bystanders while EPA makes new reregistration decisions for endosulfan;

8        F.    Order interim protective measures to prevent harm to threatened and endangered

9    species and their designated critical habitat until the ESA section 7(a)(2) consultation process is

10   complete and EPA has brought endosulfan registration into compliance with section 7 of the

11   ESA;

12       G.    Award plaintiffs PANNA, UFW, NRDC, Teamsters Local 890, Beyond

13   Pesticides, PCUN, CEH, and FLOC their reasonable fees, expenses, costs, and disbursements,

14   including attorneys' fees associated with this litigation under the Equal Access to Justice Act, 28

15   U.S.C. § 2412;

16       H.    Award NRDC and Beyond Pesticides their reasonable fees, expenses, costs, and

17   disbursements, including attorneys' fees associated with this litigation under the citizen suit

18   provision of the ESA, 16 U.S.C. § 1540(g)(4);

19       I.    Grant plaintiffs such further and additional relief as the Court may deem just and

20   proper.

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT
AND INJUNCTIVE RELIEF   -19-

*Earthjustice*
*705 Second Ave., Suite 203*
*Seattle, WA  98104*
*(206) 343-7340*

1    Respectfully submitted this 24th day of July, 2008.

2

3                                    /s/  Gregory C. Loarie

4                                    GREGORY C. LOARIE (CSB #215859)
                                     Earthjustice

5                                    426 - 17th Street, 5th Floor
                                     Oakland, CA  94612

6                                    (510) 550-6725

7                                    (510) 550-6749 *[FAX]*
                                     gloarie@earthjustice.org

8
                                     *Local Counsel for Plaintiffs Pesticide Action*

9                                    *Network North America, United Farm Workers,*
                                     *Natural Resources Defense Council, Teamsters*

10                                   *Local 890, Beyond Pesticides, Pineros y*
                                     *Campesinos Unidos del Noroeste, Center for*

11                                   *Environmental Health, Farm Labor Organizing*
                                     *Committee, AFL-CIO, and Alaska Community*

12                                   *Action on Toxics*

13

14                                   JOSHUA OSBORNE-KLEIN (WSB #36736)
                                     KRISTEN L. BOYLES (CSB #158450)

15                                   Earthjustice
                                     705 Second Avenue, Suite 203

16                                   Seattle, WA  98104
                                     (206) 343-7340

17                                   (206) 343-1526 *[FAX]*
                                     josborne-klein@earthjustice.org

18                                   kboyles@earthjustice.org

19
                                     SHELLEY DAVIS (CSB #84539)

20                                   VIRGINIA RUIZ (CSB #194986)
                                     Farmworker Justice

21                                   1126 – 16th Street, N.W., Suite 270
                                     Washington, D.C.  20036

22                                   (202) 293-5420

23                                   (202) 293-5427 *[FAX]*
                                     sdavis@nclr.org

24                                   vruiz@nclr.org

25                                   *Attorneys for Plaintiffs*

26

27

28

COMPLAINT FOR DECLARATORY JUDGMENT                    *Earthjustice*
AND INJUNCTIVE RELIEF   -20-                           *705 Second Ave., Suite 203*
                                                       *Seattle, WA  98104*
                                                       *(206) 343-7340*

# EXHIBIT A



BOZEMAN, MONTANA   DENVER, COLORADO   HONOLULU, HAWAI'I
INTERNATIONAL   JUNEAU, ALASKA   OAKLAND, CALIFORNIA
SEATTLE, WASHINGTON   TALLAHASSEE, FLORIDA   WASHINGTON, D.C.

May 13, 2008

*Via Certified Mail, Return Receipt Requested*

Stephen Johnson
Administrator
Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, D.C.  20460

Carlos Gutierrez
Secretary of Commerce
U.S. Department of Commerce
1401 Constitution Avenue, N.W.
Washington, D.C.  20230

Dirk Kempthorne
Secretary of the Interior
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C.  20240

       Re:    Notice of Violation of the Endangered Species Act: Failure to Consult Regarding
                Impacts of EPA's Reregistration of Endosulfan on Threatened and Endangered
                Species

Greetings:

      On behalf of Beyond Pesticides and Natural Resources Defense Council,[1] we ask that the
Environmental Protection Agency ("EPA") take immediate action to remedy its violation of the
Endangered Species Act ("ESA").  By reregistering endosulfan, a highly toxic organochlorine
pesticide, EPA is in violation of Section 7(a)(2) of the ESA by taking an action that "may affect"
ESA-listed species without having first engaged in consultation under the ESA with the U.S.
Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS")

---

[1] A list of these organizations' business addresses is appended.

Endosulfan 60-Day Notice
May 13, 2008
Page 2

(collectively "the Services").  16 U.S.C. § 1536(a)(2).  Moreover, allowing endosulfan to be used during consultation constitutes a violation of Section 7(d) of the Act, which prohibits the "irretrievable commitment of resources" pending completion of consultation.  16 U.S.C. § 1536(d).  This letter constitutes notice required by Section 11(g) of the ESA, 16 U.S.C. § 1540(g), prior to commencement of legal action.

## BACKGROUND

Endosulfan is an acutely toxic organochlorine insecticide.  Used in the United States on tomatoes, cotton and other crops, endosulfan can cause reproductive and developmental damage in both humans and wildlife.  Exposure to small amounts of endosulfan can cause central nervous system disorders in wildlife, such as dizziness, breathing difficulties, convulsions, loss of consciousness, and death.  Many organochlorine pesticides, including DDT and chlordane, were banned in the 1970's and early 1980s.

Developed in the early 1950s and first registered by EPA in 1954, by 2000 EPA had cancelled all U.S. home and garden uses of endosulfan.  Endosulfan is banned entirely in the European Union and many other countries, including Cambodia, Pakistan, and the Philippines.  Endosulfan has been proposed for a global ban under the Stockholm Convention on Persistent Organic Pollutants.  In early 2008, a petition signed by more than 13,000 people asked EPA to ban endosulfan in the United States.

Once in the environment, endosulfan is mobile and persistent.  As it degrades, it breaks down into endosulfan sulphate and endosulfan diol, both of which are equally toxic and the former even more persistent than endosulfan.  Endosulfan has been found in remote areas from the Great Lakes to the Artic, and the chemical has been detected in polar bears from Svalbard, Norway and the blubber of minke whales.  A 2008 report by the National Parks Service found that endosulfan commonly contaminates air, water, plants and fish of U.S. National Parks – most of which are far from areas where endosulfan is used.

Endosulfan is particularly harmful to aquatic ecosystems, as it bioaccumulates in fish.  Between 1980 and 1989, endosulfan was responsible for more U.S. fish kills in estuaries and coastal rivers than all other pesticides used at that time.  IRED at 34.  Indeed, despite the 1991 addition of a 300-foot spray drift buffer around rivers, lakes, and streams, endosulfan has continued to poison water bodies and kill fish and other aquatic life.  Id.  Endosulfan was the most frequently detected insecticide in tadpole and adult frog tissues in a California study, and the higher frequency of occurrence was in the Sierra Nevada mountains east (and upwind) of the Central Valley.  Id. at 32.  EPA has also found that "in any single year there is a 60 to 90% probability that 30-75% of species in surface water adjacent to fields, treated with endosulfan at typical application rates, will experience 50% mortality."  EPA, Biological and Economic Analysis of Endosulfan Benefits on Selected Crops (July 12, 2002).

Endosulfan 60-Day Notice
May 13, 2008
Page 3

The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") prohibits the use of a pesticide in the United States unless EPA has registered the pesticide for a particular use. 7 U.S.C. § 136a. EPA may only register a pesticide if it determines that "when used in accordance with widespread and commonly recognized practice," the pesticide "will not generally cause unreasonable adverse effects on the environment." Id. at § 136a(c)(5); see also id. at § 136a-1(a)(2). FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide . . . ." Id. at § 136(bb).

After registering or reregistering a pesticide use, EPA retains discretionary involvement and control over that registration. EPA has the authority to cancel pesticide registrations whenever "a pesticide or its labeling or other material required to be submitted does not comply with the provisions of [FIFRA], when used in accordance with widespread and commonly recognized practice, generally causes unreasonable adverse effects on the environment." 7 U.S.C. § 136d(b). EPA must periodically review pesticide registrations, and should strive to complete such reviews every 15 years. Id. at § 136a(g)(1).

In November 2002, EPA reregistered endosulfan for use on melons, lettuce, sweet potatoes, tomatoes, cotton, broccoli, cauliflower, nuts, carrots, beans, and peas. Endosulfan Interim Reregistration Eligibility Decision ("IRED") at 4. In this reregistration, despite finding ecological risks, EPA reduced the protective spray buffer for ground applications to 100 feet between a treated area and water bodies. EPA also required a 30 foot vegetative buffer strip between a treated area and water bodies.

### EPA VIOLATED ESA § 7 BY FAILING TO CONSULT ON THE ENDOSULFAN REREGISTRATION

1.    *Legal framework*

Under ESA § 7(a)(2), "[e]ach federal agency shall ... insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2). The obligation to "insure" against a likelihood of jeopardy or adverse modification requires the agencies to give the benefit of the doubt to endangered species and to place the burden of risk and uncertainty on the proposed action. See Sierra Club v. Marsh, 816 F.2d 1376, 1386 (9th Cir. 1987). The substantive duty imposed by § 7(a)(2) is constant, relieved only by an exemption from the Endangered Species Committee. 16 U.S.C. § 1536(h); Conner v. Burford, 848 F.2d 1441, 1452 n.26 (9th Cir. 1988).

Section 7 establishes an interagency consultation process to assist federal agencies in complying with their duty to ensure against jeopardy to listed species or destruction or adverse modification of critical habitat. An agency must initiate consultation with NMFS or FWS under

Endosulfan 60-Day Notice
May 13, 2008
Page 4

Section 7 whenever it takes an action that "may affect" a listed species. See 50 C.F.R. § 402.14(a). The Ninth Circuit Court of Appeals has construed the term "action" broadly. See Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054-55 (9th Cir. 1994); Connor v. Burford, 868 F.2d 1441, 1453 (9th Cir. 1988). The requirements of Section 7(a)(2) apply to the granting licenses such as pesticide registrations. See 50 C.F.R. § 402.02. EPA's maintenance of FIFRA pesticide registrations constitute ongoing agency actions under Section 7(a)(2). Washington Toxics Coal. v. EPA, 413 F.3d 1024, 1033 (9th Cir. 2005). EPA must consult with the Services to ensure that its pesticide registrations comport with the substantive duties imposed by Section 7(a)(2).

As a result of consultation, the federal agency will obtain either a written concurrence letter from NMFS or FWS that the proposed action is "not likely to adversely affect" listed species or their habitat, 50 C.F.R. §§ 402.13, 402.14(b)(1), or a biological opinion evaluating the effects of the federal action on listed species and their critical habitat. 50 C.F.R. § 402.14(a); see generally Thomas v. Peterson, 753 F.2d 754, 763 (9th Cir. 1985). If NMFS or FWS concludes that a proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, NMFS or FWS must propose a reasonable and prudent alternative, if available, that will mitigate the proposed action so as to avoid jeopardy and/or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3).

Separately, ESA § 7(d) prohibits federal agencies, after the initiation of consultation under ESA § 7(a)(2), from making any irreversible or irretrievable commitment of resources if doing so would foreclose the implementation of reasonable and prudent alternatives. 16 U.S.C. § 1536(d); Natural Resources Defense Council v. Houston, 146 F.3d 1118, 1128 (9th Cir. 1998) (Section 7(d) violated where Bureau of Reclamation executed water service contracts prior to completion of formal consultation); Marsh, 816 F.2d at 1389 (construction of highway outside species habitat barred by § 7(d) pending completion of consultation). This prohibition is not an exception to the requirements of § 7(a)(2); it is in addition to the requirements of § 7(a)(2); and it ensures that § 7(a)(2)'s substantive mandate is met. See, e.g., Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994); Greenpeace v. National Marine Fisheries Serv., 80 F. Supp. 2d 1137 (W.D. Wash. 2000).

> 2.    *The reregistration of endosulfan "may affect" threatened and endangered species and adversely modify their designated critical habitat.*

The threshold for a "may affect" determination and required ESA § 7 consultation is low. See 51 Fed. Reg. 19,926, 19,949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement."). Reregistration of endosulfan unquestionably "may affect" threatened and endangered species and their designated critical habitat.

Endosulfan 60-Day Notice
May 13, 2008
Page 5

In its reregistration, EPA acknowledged that endosulfan posed risks "acute and chronic risks to all taxa of endangered/threatened animals – birds, mammals, fish, aquatic invertebrates, amphibians, reptiles and terrestrial for all currently registered uses of endosulfan." IRED at 33. In 1989, FWS issued a biological opinion on endosulfan under § 7(a)(2), finding that endosulfan potentially affected 130 listed species, causing jeopardy to 43 protected species. IRED at 33.

Endosulfan is used in areas where listed species and their designated critical habitat occur. For example, in 2005, approximately 83,212 pounds of endosulfan were used in California, with reported use occurring in Fresno, Kings, Imperial, Riverside, Kern, Siskiyou, Yolo, Solano, Sutter, Tulare, Colusa, Monterey, Madera, Santa Clara, San Benito, Ventura, Merced, Sonoma, San Joaquin, Los Angeles, Placer, Santa Cruz, Santa Barbara, San Mateo, and Amador counties. PAN Pesticides Database, Endosulfan Use Statistics for 2005.[2] Over 50 threatened and endangered species live in those counties and may be affected by endosulfan. For example, the endangered San Joaquin kit fox, threatened Western snowy plover, and endangered blunt-nosed leopard lizard are only three of many endangered and threatened species that live within one mile of endosulfan uses. California Department of Pesticide Regulation, Species by Pesticide at 115-16.[3] Additionally, atmospheric transport has caused contamination of snow in Sequoia National Park and water in the Lake Tahoe Basin in the Sierra Nevada mountains, an area home to listed species including Sierra Nevada bighorn, Lahontan cutthroat trout, Paiute cutthroat trout, Central Valley chinook salmon, Central Valley steelhead, Little Kern golden trout, Least Bell's vireo, southwestern willow flycatcher, and California red-legged frog.

Endosulfan use in other regions of the country also harms listed species. The intensive agriculture in South Florida impacts fragile natural ecosystems in the Everglades and marine bays. Endosulfan's concentrations in surface water often exceed the water quality criteria of the Florida Department of Environmental Protection. A field study conducted during 1993 to 1997 showed that endosulfan was detected in water samples at 100% of 12 monitoring sites in South Florida.[4] Eight of these monitoring sites within agricultural areas were in canals that drained into Florida Bay. In Florida Bay, endangered Atlantic ridley and hawksbill sea turtles, threatened green and loggerhead sea turtles, endangered American crocodiles, threatened American alligators, endangered manatees, and endangered wood storks all make their home.

---

[2] Available at http://www.pesticideinfo.org/Detail_ChemUse.jsp?Rec_Id=PC35085 (last viewed Feb. 29, 2008).

[3] Available at http://www.cdpr.ca.gov/docs/endspec/espdfs/spxpest.pdf (last viewed Feb. 29, 2008).

[4] Scott, G.I., M.H. Filton, E.F. Wirth, G.T. Chandler, P.B. Key, J.W. Daugomah, D. Bearden, K.W. Chung, E.D. Strozier, M. Delorenzo, S. Sivertsen, A. Dias, M. Sanders, J.M. Macauley, L.R. Goodman, M.W. Lacroix, G.W. Thayer, and J. Kucklick. 2002. Toxicological studies in tropical ecosystems: An ecotoxicological risk assessment of pesticide runoff in south Florida estuarine ecosystems. J. Agric. Food Chem. 50:4400–4408.

Endosulfan 60-Day Notice
May 13, 2008
Page 6

EPA's decision to reregister endosulfan easily trips the "may affect" trigger for ESA § 7(a)(2) consultation.

> 3.    *EPA did not consult on the endosulfan reregistration.*

Despite the presence of threatened and endangered species in areas where endosulfan is used, and EPA's acknowledgment that endosulfan may affect endangered and threatened species, EPA did not consult with the Services to ensure that reregistering endosulfan would not jeopardize listed species or adversely modify their critical habitat. IRED at 33. This failure to consult on an action that "may affect" listed species violates the Endangered Species Act.

*            *            *

Sincerely,

Joshua Osborne-Klein
Kristen L. Boyles
*Attorneys for Beyond Pesticides and NRDC*

cc:    Debra Edwards, Director
       EPA Office of Pesticide Programs
       1200 Pennsylvania Avenue, N.W. (7501P)
       Washington, D.C.  20460

       Elin D. Miller
       EPA Region X Administrator
       1200 Sixth Avenue
       Seattle, WA  98101

       Wayne Nastri
       EPA Region IX Administrator
       75 Hawthorne Street
       San Francisco, CA  94105

       John Oliver
       NMFS Acting Director
       1315 East West Highway
       Silver Spring, MD  20910

Endosulfan 60-Day Notice
May 13, 2008
Page 7


cc:     Bob Lohn
        NMFS Northwest Regional Director
        7600 Sand Point Way N.E.
        Seattle, WA  98115

        Rodney McInnis
        NMFS Southwest Regional Director
        501 West Ocean Blvd., Suite 4200
        Long Beach, CA  90802-4213

        H. Dale Hall
        FWS Director
        1849 C Street, N.W., Room 3238
        Washington, D.C.  20240

        Ren Lohoefener
        FWS Pacific Regional Director
        911 NE 11th Avenue
        Portland, OR  97232

        Steve Thompson
        FWS California and Nevada Regional Director
        2800 Cottage Way
        Sacramento, CA  95825

Endosulfan 60-Day Notice
May 13, 2008
Page 8

<u>Business Addresses for Named Organizations</u>

Beyond Pesticides
701 E Street S.E., Suite 200
Washington, D.C.  20003

Natural Resources Defense Council
1200 New York Avenue, N.W., Suite 400
Washington, D.C.  20005